NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

HAYLEY W., GARY W.,
*Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, C.W., CHEROKEE NATION,
*Appellees*.

No. 1 CA-JV 18-0474
FILED 6-6-2019

Appeal from the Superior Court in Yavapai County
No. P1300JD201700090
The Honorable Anna C. Young, Judge

**AFFIRMED**

COUNSEL

Law Office of Florence M. Bruemmer, P.C., Anthem
By Florence M. Bruemmer
*Counsel for Appellant Hayley W.*

Berkshire Law Office, P.L.L.C., Tempe
By Keith Berkshire, Erica L. Gadberry
*Counsel for Appellant Gary W.*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

Law Office of Sarah J. Michael, Glendale
By Robert Ian Casey
*Guardian Ad Litem for C.W.*

---

**MEMORANDUM DECISION**

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

---

**J O N E S**, Judge:

**¶1**         Hayley W. (Mother) and Gary W. (Father) appeal the termination of their parental rights to C.W. (Child), an Indian child.  Mother argues Child's guardian ad litem (GAL) failed to prove severance was warranted under Arizona Revised Statutes (A.R.S.) § 8-533 and the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 to 1963, by clear and convincing evidence, and failed to prove termination of her parental rights was in Child's best interests.  Father argues he was deprived of due process when the juvenile court declined to continue the termination adjudication hearing until after resolution of certain criminal charges and by virtue of ineffective assistance of counsel.  For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**         In November 2017, Mother and Father brought five-month-old Child to the emergency room with an unexplained acute fracture to his right humerus.[1]  The emergency room physician reported that neither the arm injury, nor the seven other fractures he discovered on Child's ribs and left arm, correlated to accidental trauma.  When questioned by DCS, both parents denied any traumatic event and suggested the other fractures occurred when Child fell from a changing table six to eight weeks earlier.  After being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 468-70 (1966), Father admitted to law enforcement that he had pushed Child's arm down the night before, causing it to "pop," when he was frustrated Child would not take a pacifier.  Father also admitted he had caused the other fractures when he "yanked" Child off the changing table

---

[1]      "[W]e view the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision."  *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citing *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002)).

because Child would not stop crying. Father stated he dressed Child carefully and feigned ignorance of the injuries to hide his behavior from Mother. Father was arrested and charged with two counts of child abuse.

¶3            DCS took temporary custody of Child and filed a petition alleging he was dependent as to both parents on the grounds of abuse and neglect. The juvenile court adjudicated Child dependent and adopted a case plan of family reunification concurrent with severance and adoption.

¶4            A subsequent bone scan revealed two more unexplained fractures in Child's left tibia and right big toe. Further evaluation revealed Child's bone health and development were normal, and Child had no medical condition that would have contributed to the injuries. According to the testifying medical expert, these circumstances indicated Child, a non-mobile infant, had suffered from multiple distinct episodes of non-accidental, direct force trauma. Meanwhile, Father recanted his confession and denied harming Child.

¶5            DCS referred Mother for counseling, parenting classes, and supervised visitation. Although Mother progressed through her services, she continued to live with Father, who was ordered through the criminal court to have no contact with Child. DCS initially noted this was "somewhat concerning but also understandable" and encouraged Mother to continue with individual counseling.

¶6            In March 2018, Mother falsely reported that Child's injuries were due to "soft bones" caused by inadequate breastmilk. DCS then expressed concern that Mother had "thus far been unaccepting of th[e] high probability" that Father caused Child's injuries and had "thus far chosen to side with [Father]." Child's GAL echoed these concerns. DCS again encouraged Mother to continue with individual counseling and to evaluate her relationship with Father, "particularly in light of the evidence that strongly points to [Father] as having caused injuries to their son."

¶7            Thereafter, when DCS raised its concern about Mother's relationship with Father, Mother would "divert the conversation . . . saying that she would wait until [Father] was either found guilty or not guilty in court." Although Mother stated she would end the relationship if Father were convicted, recorded phone calls from the jail revealed the two had no plans to divorce; rather, the parents anticipated Child would return to Mother's care, after which they would "reunite following the pretense of divorce" and raise Child together.

¶8          In June 2018, the GAL moved to terminate Mother's and Father's parental rights to Child on the grounds of abuse, neglect, and the length of time in out-of-home care.  The juvenile court set a termination adjudication hearing for September.

¶9          By the time of the termination adjudication hearing, neither parent had accepted any responsibility for Child's injuries or acknowledged them as non-accidental.  An ICWA expert testified that DCS had gone "above and beyond" and "done all they could do" to provide remedial services for Child's family.  However, so long as the parents remained in denial, the circumstances leading to the abuse could not be identified or resolved.  Indeed, there were no services capable of remedying the physical harm that had already occurred.  And although Mother acted as an appropriate parent during her short visits with Child, she had not engaged in any unsupervised or extended parenting time "where it can get really stressful and hard to manage."   Given these circumstances and Child's inability to protect himself at his young age, Mother's counselor, the DCS case manager, and the ICWA expert all testified that Child remained at risk for serious emotional or physical injury in either parent's care.

¶10          The counselor, DCS case manager, and ICWA expert likewise agreed termination of Mother's and Father's parental rights was in Child's best interests.  Child was adoptable and in an adoptive placement with his maternal grandparents, and severance would give him an opportunity for permanency in a safe home.  The ICWA expert added that, after nearly ten months in out-of-home care, Child deserved permanency — not to wait and see if Father would be convicted or if Mother would move on from the relationship.

¶11          During the parents' testimony, Mother admitted she and Father had been Child's primary caretakers, but both parents asserted a Fifth Amendment right to refuse questions regarding the cause of Child's injuries while Father's criminal case remained pending.  Mother added that she did not believe Father had harmed Child or posed any present danger to Child and affirmed that she would remain in a relationship with him unless and until he was found guilty of the criminal charges.

¶12          After taking the matter under advisement, the juvenile court found evidence beyond a reasonable doubt, including the testimony of an ICWA specialist, that DCS had made active efforts to prevent the breakup of the Indian family but that continued custody with the parents would likely result in serious emotional or physical harm to Child.  The court determined the GAL had proved by clear and convincing evidence that

termination of both parents' parental rights was warranted because each had either willfully abused Child or failed to protect him from neglect and abuse, *see* A.R.S. § 8-533(B)(2),[2] and termination of Mother's parental rights was further warranted because she had "substantially neglected or willfully refused to remedy the circumstances" causing Child to be in an out-of-home placement for more than six months, *see* A.R.S. § 8-533(B)(8)(b). The court also found the GAL had proved by a preponderance of the evidence that severance from both parents was in Child's best interests and entered an order terminating Mother's and Father's parental rights. Both parents timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

**I.     The Juvenile Court's Findings and Conclusions Regarding Termination of Mother's Parental Rights are Supported by the Record.**

¶13         Generally, the juvenile court may terminate parental rights if it finds that a statutory ground exists and termination is in the child's best interests. *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 9 (2009) (citing A.R.S. §§ 8-533(B), -537(B), and *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005)). When the child is an Indian child, ICWA requires two additional findings. First, the court must find by clear and convincing evidence that active efforts at "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" were made and were unsuccessful. 25 U.S.C. § 1912(d); Ariz. R.P. Juv. Ct. 66(C); *see also Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 421, ¶ 26 (App. 2011) (holding "the necessary ICWA 'active efforts' finding must . . . be made under the clear and convincing evidence standard"). Second, the court must make "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). We review the court's findings regarding the statutory grounds for severance, the best interests of the child, and the additional ICWA requirements for an abuse of discretion and will affirm "unless we must say as a matter of law that no one could reasonably find the evidence" sufficient to support them.

---

[2]         Absent material changes from the relevant date, we cite the current version of rules and statutes.

*See Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95, ¶ 10 (App. 2009) (internal quotation omitted).

### A. Active Efforts

**¶14** Mother argues active efforts were not made to prevent the break-up of the Indian family because she was never told she had to live separately from Father to achieve reunification. She separately contends this omission deprived her of due process.

**¶15** What constitutes "active efforts" varies depending upon the circumstances and the asserted grounds for severance and "will not always implicate formal public services." *S.S. v. Stephanie H.*, 241 Ariz. 419, 425, ¶¶ 21-23 (App. 2017) (explaining that active efforts to prevent a parent from abandoning a child might include simply keeping a parent informed and encouraging meaningful contact). The requirement of active efforts is generally satisfied so long as the parent is given the time and opportunity to become an effective parent. *See Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶16** Mother was not, as she contends, "expected to figure out how to satisfy DCS and/or the trial court that she was able to protect [Child]." Rather, Mother was provided with uncontradicted medical evidence that her non-mobile infant had suffered nearly a dozen skeletal fractures caused by several distinct episodes of non-accidental, direct force trauma. Indeed, Father initially admitted having inflicted the injuries while frustrated with Child, for whom he was a primary caregiver. Mother was also advised that her continued allegiance to Father was concerning and was encouraged to evaluate her relationship with him given the likelihood that he had physically abused Child. Mother chose to ignore the circumstances, relying instead upon cryptic references to unidentified and undisclosed records "that prove otherwise" to support her decision to remain with Father. And although Mother did attend counseling and parent aide services, she focused on general parenting skills and grief counseling, rather than on her ability to identify unsafe situations or the challenges posed by her relationship with Father.

**¶17** A parent cannot be forced to act appropriately. *Yvonne L.*, 227 Ariz. at 423, ¶ 34 (citing *JS-501904*, 180 Ariz. at 353). The evidence is sufficient to support the juvenile court's conclusion that Mother was given the information, time, and opportunity needed to appreciate, acknowledge, and address the risk Father posed to Child. Therefore, active efforts were

made to prevent the breakup of the Indian family, and Mother has failed to prove any error or due process violation.

## B.    Serious Emotional or Physical Damage

**¶18**        Mother argues the juvenile court erred in finding that Mother's continued custody of Child was likely to cause him serious emotional or physical damage. *See* 25 U.S.C. § 1912(f). A determination that an Indian child will likely suffer serious harm if returned to the custody of the parent requires evidence "both that the parent's conduct is likely to harm the child and that the parent is unlikely to change her conduct." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 571-72 (2008) (quoting *E.A. v. State*, 46 P.3d 986, 992 (Alaska 2002), and citing *Thomas H. v. State*, 184 P.3d 9, 19 (Alaska 2008)).

**¶19**        To support her argument, Mother points to evidence indicating she did not directly harm Child and believed she could and would protect him. But we do not reweigh evidence on appeal; the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M.*, 203 Ariz. at 205, ¶ 4 (citing *Pima Cty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987)); *see also Kocher v. Dep't of Revenue of Ariz.*, 206 Ariz. 480, 482, ¶ 9 (App. 2003) ("A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting evidence exists.").

**¶20**        The juvenile court was entitled to draw a negative inference from Mother's invocation of her right against self-incrimination when questioned about the source of Child's injuries. *See Montoya v. Superior Court*, 173 Ariz. 129, 131 (App. 1992); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (recognizing "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). But even if Mother did not directly injure Child, she never acknowledged that the injuries were non-accidental or that they were most likely inflicted by Father over the course of multiple fits of frustration. Instead, Mother remained in a romantic relationship with Father and maintained his innocence nearly a year after the dependency proceedings were initiated, despite Father's confession, the existing medical opinions, and the lack of any other credible explanation for Child's injuries. Mother's willful ignorance of the danger Father poses to Child creates a risk of continuing harm, and her actions during the dependency support a finding that she is unlikely to change her conduct. On this record, we find no error in the determination that

Mother's continued custody of Child was likely to cause him serious emotional or physical damage.

### C.      Statutory Grounds for Severance

**¶21**      Mother argues the GAL failed to prove the statutory grounds for severance by clear and convincing evidence.  A parent's rights may be terminated pursuant to A.R.S. § 8-533(B)(8)(b) when a child under three "has been in an out-of-home placement for . . . six months or longer . . . and the parent has substantially neglected or wil[l]fully refused to remedy the circumstances that cause the child to be in an out-of-home placement." Because this subsection was adopted to address the growing number of children lingering in foster care while "parents maintain parental rights but refuse to assume their parental responsibilities," severance based upon a child's time in an out-of-home placement is not limited to those who have completely neglected to remedy the circumstances or completely failed to participate in services. *Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994).  Thus, although a parent who makes "appreciable, good faith efforts" at reunification "will not be found to have substantially neglected to remedy the circumstances that caused out-of-home placement, . . . a trial court is well within its discretion in finding substantial neglect" where the parent "expend[s] only minimal effort." *Id.* at 576.

**¶22**      "[I]t is difficult to define the level of effort that would exempt a parent from severance" upon this ground, *see id.* at 576 n.1, but we find no clear error in the juvenile court's conclusion here.  Child was placed in out-of-home care after Father admitted causing serious physical injuries to Child out of frustration.  Mother admitted she and Father were Child's primary caregivers but, inexplicably, denied either parent had harmed Child and refused to acknowledge the injuries were non-accidental. Mother participated in services designed to improve her parenting, but she continued to reside with Father, knowing DCS, the GAL, and the court viewed him as a threat to Child, and knowing Child could not return to her and Father's shared home as a result of the criminal no-contact order. Although Mother sometimes indicated she would separate from her relationship and home with Father, she did not take any steps to do so.

**¶23**      Mother's actions here were not the "appreciable, good faith efforts" contemplated by A.R.S. § 8-533(B)(8)(b). *See JS-501568*, 177 Ariz. at 576.  Rather, her steadfast refusal to acknowledge the danger Father posed to Child is commensurate with substantial neglect or willful refusal to remedy the circumstances causing Child's out-of-home placement; Mother

cannot defeat severance by simply refusing to accept the factual circumstances underlying the dependency.[3]  We find no error.

### D.     Best Interests

**¶24**        Mother argues the juvenile court abused its discretion in concluding termination was in Child's best interests because she shares a bond with him and has made efforts to improve her ability to parent. Termination is in a child's best interests if, given the particular circumstances, the child "would derive an affirmative benefit from termination or incur a detriment by continuing in the relationship."  *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004); *accord Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 16 (2016).  The existence of a bond between the parent and child is relevant but not dispositive, *Dominique M. v. DCS*, 240 Ariz. 96, 98-99, ¶ 12 (App. 2016) (citing *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 351, ¶ 30 (App. 2013)), and a child will generally benefit from the opportunity for permanency in lieu of remaining with an unfit parent, *see Oscar O.*, 209 Ariz. at 337, ¶ 16 (quoting *JS-6520*, 157 Ariz. at 243).  The court may also consider whether the presence of a statutory ground for severance will have a negative effect upon the child.  *Bennigno R.*, 233 Ariz. at 350, ¶ 23 (quoting *Maricopa Cty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988)).

**¶25**        Here, the juvenile court found that Child could not safely return to Mother and that termination would free him for adoption into a safe, stable home free from physical abuse.  The court also found Child was adoptable and in an ICWA-compliant adoptive placement with his maternal grandparents.  The record supports these findings and provides an adequate basis to conclude severance was in Child's best interests.  We will not second-guess the court's assessment of the evidence on appeal.  *See Oscar O.*, 209 Ariz. at 334, ¶ 4 (citing *Jesus M.*, 203 Ariz. at 280, ¶ 4). Accordingly, we find no abuse of discretion.

---

[3]        Because we find clear and convincing evidence supports the termination order based upon the time Child was in out-of-home care, we need not, and do not, consider whether the remaining grounds are supported by the record.  *Jesus M.*, 203 Ariz. at 280, ¶ 3 ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.") (citing *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000), and *Maricopa Cty. Juv. Action No. JS-6520*, 157 Ariz. 238, 242 (App. 1988)).

## II.    Father Did Not Preserve or Prove any Due Process Violation.

### A.    Continuance

¶26        Father argues the juvenile court abused its discretion and deprived him of due process when it denied his request to continue the termination adjudication hearing until after his criminal charges were resolved.  We review an order denying a continuance for an abuse of discretion.  *See Yavapai Cty. Juv. Action No. J-9365*, 157 Ariz. 497, 499 (App. 1988) (citation omitted).  Whether a party is afforded due process presents a question of law reviewed *de novo*.  *Jeff D. v. DCS*, 239 Ariz. 205, 207, ¶ 6 (App. 2016) (citing *Herman v. City of Tucson*, 197 Ariz. 430, 432, ¶ 5 (App. 1999)).

¶27        After a motion to terminate parental rights is filed, the juvenile court must set a termination adjudication hearing within ninety days of the permanency hearing.  A.R.S. § 8-862(D)(2); *accord* Ariz. R.P. Juv. Ct. 66(B).  Given the court's paramount goal of "prompt finality that protects the child's interests," *Pima Cty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97 (1994), continuances are limited:

> The court may continue the hearing beyond the ninety (90) day time limit for a period of thirty (30) days if it finds that the continuance is necessary for the full, fair and proper presentation of evidence, and the best interests of the child would not be adversely affected.  Any continuance beyond thirty (30) days shall only be granted upon a finding of extraordinary circumstances.

Ariz. R.P. Juv. Ct. 66(B).  Extraordinary circumstances "include, but are not limited to, acts or omissions that are unfor[e]seen or unavoidable" and, by rule, must be timely asserted in a written motion for extension of time.  *Id.*

¶28        The record reflects Mother filed a motion for an eight-day continuance of the September 2018 termination adjudication hearing to accommodate a scheduled medical procedure.  During discussion on that motion, Father's counsel indicated a preference for "a continuance that would place the trial after the father's criminal case concludes" in December — more than seven months after the termination motion was filed.  Both DCS and the GAL objected to a continuance beyond the statutory timeframe.

¶29        Father did not file a motion to continue the termination adjudication hearing and did not articulate any extraordinary

circumstances he believed would justify a lengthy continuance. Because Father did not comply with Rule 66(B) and did not assert the continuance to be "necessary for the full, fair and proper presentation of evidence," *id.*, or without adverse affect to Child's best interests,[4] we cannot say the juvenile court acted outside of its discretion in declining his request.

**¶30** Nor has Father shown that the denial of the continuance violated his due process. The U.S. Constitution affords a parent in a termination proceeding the privilege of asserting his Fifth Amendment right against self-incrimination. *See* U.S. Const. amend. V; *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 13 (App. 2001) (citing *In re Gault*, 387 U.S. 1, 47-48 (1967)). The decision to assert the privilege is not without consequence. A parent is bound to his silence; he "cannot testify for his . . . own advantage and then invoke the privilege and claim the right to be free from cross-examination." *Montoya*, 173 Ariz. at 131 (citing *Brown v. United States*, 356 U.S. 148, 155-56 (1958), and *State v. Taylor*, 99 Ariz. 85, 91 (1965)). Additionally, the trial judge is free to draw a negative inference from the invocation. *Id.* (citing *Buzard v. Griffin*, 89 Ariz. 42, 48 (1960), and *Ikeda v. Curtis*, 261 P.2d 684, 690 (Wash. 1953)).

**¶31** But neither does the decision to assert the privilege against self-incrimination deprive a parent of a meaningful opportunity to be heard at the termination adjudication hearing. A parent who chooses to avoid the possibility of self-incrimination by remaining silent retains his right to participate in the proceedings and present other evidence to support his position. *Cf. Brenda D. v. DCS*, 243 Ariz. 437, 446, ¶ 30 (2018) (concluding a parent's due process rights were satisfied even without her participation

---

[4] Father urges us to adopt the three-factor test identified by the Alabama Court of Civil Appeals in *R.B. v. Elmore County Department of Human Resources*, 75 So. 3d 1195 (Ala. Civ. App. 2011), for determining whether a parent's intent to assert the privilege against self-incrimination justified continuance of a related severance proceeding. We decline to do so. The *R.B.* factors — whether the juvenile and criminal proceedings are parallel, whether the parent's constitutional rights will be threatened, and the balance of those constitutional rights against the child's interest in permanency, *see id.* at 1201 (quoting *Ex parte Rawls*, 953 So. 2d 374, 378 (Ala. 2006)) — are encompassed within Rule 66(B), which already directs the juvenile court to consider, when exercising its discretion to continue a termination adjudication hearing, the existence of extraordinary circumstances, as well as whether "the continuance is necessary for the full, fair and proper presentation of evidence," and whether "the best interests of the child would . . . be adversely affected."

where "the absent parent's counsel has a right to fully participate in the hearing on the parent's behalf, including a right to cross-examine the state's witnesses, object to proffered evidence, and present witnesses or other evidence"). Father was present at the hearing and had ample opportunity to advance his position that Child's injuries were accidental through Mother's testimony, cross-examination of the medical professionals, and reports summarizing his position. Accordingly, we find no due process violation.

### B.      Assistance of Counsel

¶32        Father also argues he was deprived of due process because his counsel was ineffective. Assuming without deciding that ineffective assistance of counsel provides a basis for reversible error in a severance proceeding, the parent must show "that counsel's representation fell below prevailing professional norms." *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 322-23, 325, ¶¶ 8, 17 (App. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and *Pima Cty. Severance Action No. S-2397*, 161 Ariz. 574, 578 (App. 1989)). Moreover:

> [N]o reversal of a termination order is justified by inadequacy of counsel unless, at a minimum, a parent can demonstrate that counsel's alleged errors were sufficient to "undermine confidence in the outcome" of the severance proceeding and give rise to a reasonable probability that, but for counsel's errors, the result would have been different.

*Id.* at 325, ¶ 18 (citing *Strickland*, 466 U.S. at 692-94).

¶33        Father complains his counsel was ineffective because she: (1) did not properly request a continuance; (2) did not question Father on direct or cross-examination; (3) did not subpoena the law enforcement officers who took Father's confession; and (4) did not cross-examine the medical expert who testified regarding Child's injuries. But "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, . . . that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Pandeli*, 242 Ariz. 175, 181, ¶ 7 (2017) (quoting *Strickland*, 466 U.S. at 689). Thus, "reviewing courts must be very cautious in deeming trial counsel's assistance ineffective when counsel's challenged acts or omissions might have a reasonable explanation." *Id.* And it takes no great imagination to see how the actions Father now complains of could have undermined his position: Father could have been convicted of the criminal

charges, and further testimony from Father, law enforcement, or the nurse practitioner could have strengthened the case against him. Father has not overcome the presumption that these actions represented reasonable, strategic decisions of competent counsel. *See S-2397*, 161 Ariz. at 578.

¶34 Father also complains his counsel was ineffective because she: (1) did not object to the admission of the police report; and (2) did not object when the medical expert testified regarding purportedly undisclosed medical records. But the contents of the police report — namely, Father's confession to harming Child — are cumulative to and consistent with other properly admitted testimony. *See State v. Fulminante*, 161 Ariz. 237, 245-46 (1988) (holding that the admission of evidence is harmless when it is cumulative to and consistent with other properly admitted evidence); *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239, ¶ 17 (App. 2012) (finding no prejudice in the erroneous admission of evidence where "other overwhelming evidence" established the parent's abuse of the children). Additionally, Father fails to state any legal basis justifying exclusion of the facts underlying the medical expert's testimony that were otherwise admissible under Arizona Rule of Evidence 703 (permitting an expert to testify about the facts or data underlying her opinion, even if otherwise inadmissible, if helpful to the factfinder).

¶35 Finally, Father argues his counsel was ineffective because she did not offer any evidence or testimony that would suggest Child's injuries resulted from something other than physical abuse. Even assuming trial counsel was deficient in this regard — a fact we need not resolve — we cannot say the proceedings were fundamentally unfair, that the result is unreliable, or that, had counsel conducted herself differently, the juvenile court would have reached a different result. *See John M.*, 217 Ariz. at 325, ¶ 19. To the contrary, the evidence and testimony, including Father's post-*Miranda* confession that he "yanked" and pushed at the non-mobile infant with enough force to cause multiple skeletal fractures on at least two occasions because he was frustrated, overwhelmingly supports the juvenile court's findings and conclusions regarding Father's role in Child's injuries. *Cf. State v. Encinas*, 132 Ariz. 493, 497 (1982) (finding no prejudice where the "[a]ppellant's own confession proved the elements of all the crimes charged"); *State v. Spreitz*, 190 Ariz. 129, 142 (1997) ("[W]e have no difficulty concluding beyond a reasonable doubt by reason of the overwhelming evidence against the defendant, including, most importantly, his own uncoerced confession, that the jury would have found him guilty without the [challenged evidence]."); *accord State v. Amaya-Ruiz*, 166 Ariz. 152, 182 (1990). Accordingly, Father has not proved prejudice on this final ground and therefore fails to state a basis for reversal.

## CONCLUSION

¶36　　　　The juvenile court's order terminating Mother's and Father's parental rights to Child is affirmed.

